The last case of the morning is, we have the case number as 17, sorry, well it's a bunch of consolidated cases, and the lead one on our docket sheet is 1740825. No, I'm sorry, that's the complaint case. There's so many attorneys. 1710663, FECB, Stanford, but they're a bunch of associated disputes, I believe, and I see that appellants have divided up their time a lot. I hope you've divided it up so that you're not planning to each repeat everything. I hope so, Your Honor. Well, we do too. We gave you extra time on the assumption that you would divide it up by subject matter, but we'll see. Okay, and you're Mr. Jordan? Yes, Your Honor. Okay. Good morning, and please accord. My name is Sean Jordan, and I represent Appellant Cordell Heyman. Mr. Heyman's fundamental rights to due process and access to the courts were uniquely compromised by the district court's bar order in issue here today. His rights were uniquely compromised because it's unquestionably true that as to Mr. Heyman, the bar order negates all of his claims against underwriters, extra-contractual and contractual, giving him no recourse, no benefit, and no alternative avenue for recovery whatsoever on those claims. Now, while we acknowledge that a receivership court has broad powers, the real question for this court today is whether those powers are effectively limitless. In that analysis, three key aspects as to Mr. Heyman's claim we think are important. Number one, Mr. Heyman was a director of a Stanford subsidiary, and he was a named insured on all the policies at issue. And when he was sued, he immediately asked for coverage under the policies, and when that was denied, he initiated and vigorously pursued litigation to recover. Second, after incurring about $1.5 million in his own funds defending cases, he wound up settling for $2 million, and an explicit portion of that settlement with the receiver was that he would be able to pursue his ongoing claims against underwriters, but he was not releasing those. Remind me, when was that settlement in relationship to the mediation and the discussions with the receiver and the insurance company? Mr. Heyman was not permitted to participate. Timing, though, when was that settlement entered in relationship to? Oh, I'm sorry, yes. So Mr. Heyman's settlement was completed and approved in a borrower in August of 2015, and then the following December is when there was an initial agreement between underwriters and the receiver. That didn't wind up going through. It wasn't until the following June of 2016 that they came out and said that they had an agreement, a full agreement, and started that process. So it came after the borrower. There are negotiations. You know, there may have been some before that, but this happened after his borrower. And he was, and this is critical, in the settlement agreement and borrower order that's entered, the tradeoff for Mr. Heyman losing his day in court, losing extra contractual and contractual claims is that he received nothing. He gets no alternative avenue recovery because the $65 says will be able to be distributed is only going to be distributed, for example, to investors or entities with claims against the receivership. That's not Mr. Heyman. He was a director. He's expressly excluded from that. He also gets no benefit in terms of some sort of potential protection from a lawsuit because he already had that through his borrower order. In other words, the borrower order he got already in August 2015, a year and a half or whatever before this second borrower order and their proceeding comes down, protected him. So in other words, his potential liability was non-existent at the point that they entered that borrower. So we have somebody who's... Now, I'm a little confused about that because he, who, with whom did he settle? The receiver? Yes. Okay. And you're asserting that he, the receiver can come back against him again? No. What we're saying is... Under the policy. Right. He, what happened, Judge Jones, what he was deprived of are his separate claims for reimbursement and indemnification from... I understand that. And isn't one of their points, there being the insurance companies, points that you never actually filed a suit against the insurance company? No, Judge Jones. That is some of the other appellants. Yes. To be very clear. And that's one of the things, Judge Jones, we think is very... But you had the pending suit, coverage suit, but it's been stayed or barred or... It's been barred, exactly, Judge Jones. And that deprived Mr. Heyman of two critical fundamental rights. First, as you all will appreciate, he had a contract right. He was a co-insurer. Under Texas law, as this court has found and as the Texas Supreme Court has found, those rights are held sacred. A contract right is held sacred. He's completely deprived of his contract right. He can't make a contract claim. He can't even make extra contractual claims, which this court has said in the bankruptcy context, in cases we cited to you like Zale and VTEC, this court has said those extra contractual claims are outside the jurisdiction of a bankruptcy court, and we believe that is analogous here. And he's deprived his contract claims. In addition, he's also deprived, fundamentally, of his cause of action, including a cause of potential cause of action for bad faith. And that cause of action, this court has recognized, the Supreme Court has recognized, is an intangible property right. It's a property right in the sense that it's protected by due process. What about the fact that it grows out of the insurance contract, though, to the extent that the receiver had all the proceeds of the insurance policy, whatever they ultimately were determined to be, within the receivership? Is the fact that your extra contractual claim grows out of that contract somehow for the receiver authority? We think that the extra contractual claims would still be there for at least a couple of reasons. For one thing, remember that this doesn't even dispose of all of the insurance. There are still insurance proceeds out there, as the receiver acknowledges, up to $35 million. But this, what confuses me about this for all of this group of appellants is, we're talking about their rights under the DNO policy, essentially, right? Yes, there's a couple of other policies, but yes. I understand that. But the DNO policy was, what is that, $30 million, something like that? Yes, right. Okay. And the Fifth Circuit has already held in the Pendagos case that, well, the parties didn't even disagree in the Pendagos case that former employees or officers of Stanford could call on that policy for their defense, right? This court's decision did say that at the time, right. And this is part of the problem here, is that- But you have that right. I mean, that's a contract right. Well, but the district court, what this court had said was that it was appropriate to advance the defense costs at that time. And I think it's important to have that point in time in mind, Judge Jones, because at that point, one of the things this court said is there hadn't been a court determination that would have excluded that coverage. So those policy proceeds needed to be paid was in the Pendagos. Right. And they had coverage. They had separate coverage for litigation pending, right? Right. They did. Here, we have the district court. It's okay if I finish my answer. I know my time is up. I'll do it very quickly. Here, what we have is the district court a few years later, Judge Jones, issuing a bar order that says he cannot get, in Mr. Hayman's case and the other they cannot get any of those monies back, whether it's reimbursement of defense costs or any identification of the monies that he is out. And again, I say for Mr. Hayman uniquely, he has no alternative remedy whatsoever. And that can't be fair or equitable. Well, none of them. I mean, he's not in a different position except for the fact that he has a pending litigation. Well, I think he's- Here's why I believe he is somewhat different. He's the only appellant who's going to come before you today who is settled. He already had protection. So Judge Jones, what it means is the door is completely closed to underwriters or receiver to say Mr. Hayman got any benefit whatsoever. Even some, if you will, speculative hypothetical, it just doesn't exist. So his contract rights are completely gone. His right to a cause of action is completely gone. And he gets no alternative avenue of remedy whatsoever. I would say that even under the receivers, when they moved to approve the bar order, they said three things must be present in order to be fair and equitable. It has to be necessary to get the money. There has to be a process for each person who's deprived of a claim to be able to recover. And it must be tailored to that. Their biggest one, number two, as Mr. Hayman, they do not need it. Under their own tests, he's improperly deprived of a contract right and a cause of action. And we ask that the court reverse and restore him his rights. All right, sir. Next one we have, Mr. Porter. Please, the court. My name is John Porter. I'm a law firm. I'm Smiley, Bishop and Porter in Atlanta, Georgia. We represent 27 former Stanford employees known as the Alvarado Appellants who are equal co-insured under the policies. They have been sued by the executives at Stanford. They have each incurred more than $10,000 in attorney's fees and court costs and face unowned additional covered damages. They filed timely claims for coverage, which have not been completely denied. Instead, the insurers merely declined to pay the appellant's claims until the completion of the action. So they're still waiting for the thing to be over before they say whether they're going to pay or not. May I ask, are your client's claims solely under the policy? Do you have any extra contractual claims? Yes, we do, Your Honor, because we think that they have unfairly distributed those. They have a right to settle claims with different co-insurers, but they have to do it in a reasonable manner. And we believe that the way that this has been, I mean, the collusion that's taken place in an unreasonable manner and has unfairly prejudiced our clients under these policies. They've paid people who are in jail. They've paid people who are found to be securities buyers. Is as a result of the court order approving this settlement, there's no independent claim other than your claim that the court order approving a settlement has approved this sort of pollusive conduct that you're talking about? Well, the court order doesn't do that. That's the settlement agreement between the insurance company and the policy. And as the insurer's attorney stated to district court when this was all being negotiated, in short, the receiver standing in the shoes of one of the insureds is attempting to collect millions in proceeds for his own deficient claims while leaving all the other insureds exposed to further litigation and judgment. This is a this was a cohesive negotiated deal between one big insured and at the detriment of all the other insureds. We have the right to have the court determine whether that was done in good faith or And that has nothing to do with the bar order. The bar order simply facilitates the prejudice that is created by a settlement agreement that is made between two parties, one of the co-insureds and the insurers, without the inclusion of any of the other parties. Two questions. The first is whether your clients, and I would extend this to all of the appellants here, were in fact totally in the dark about the ongoing mediation. Yes, Your Honor. We had no idea. Okay, so all of you didn't know about it until they filed their request to have the settlement approved. My clients didn't. I had no notice of it. And the second question has to do with the series of cases that hold, let's talk about the law a little bit, the series of cases that suggest that an insurer can settle a claim with one insured if it exhausts the policy limits without settling with all the insureds at the same time. That statement is accurate as far as it goes, but there are two inherent flaws in that, in this case. One is, we have a right to have it determined that the policy has in fact been exhausted. $65 million, or they've said a total of $95 million has been paid, but the receiver himself has over and over again said there's $120,000, that there's $35 million out there. That's fine for them to agree to it, but they can't stop us from looking behind the curtain and seeing whether there's more proceeds. And as long as there are proceeds in that policy, they have a good faith duty to our clients to pay the policy limits. And so, what they have done is they've entered into a collusive agreement with the receiver, you knowing that the receiver court would back them up, saying that we are going to walk away with $35 million of proceeds and get a bar that prevents the others from ever going after us in the future. Did you file suit against the insurance company on the coverage claims? No, we didn't, Your Honor. Has the statute of limitations run? No, not on the claims in which they have reserved the right to pay us when the claim is complete. Have your clients been sued by the receiver, or is he just waving his sword? He's waving his sword. He hasn't done anything. And that's the other thing about this. We were not joined in the deck action. We were not before the court when the decision was made to cut out our claims. Under the Wilkes case that we cited in our brief, you can't have, you can't be bound by an order in a case in which you were not joined. Secondly, in the city of Cleveland case, they said you can't enter into, a court can't enter into a consent decree cutting out the claims of a party who did not, or a non-party, who did not agree with that consent decree. You're talking about due process there, right? I'm talking about, yes. Well, I'm talking about, according to the Wilkes case, it's a fundamental principle of Anglo-American jurisprudence that everyone is entitled to their day in court. And we were denied that. You were given the opportunity to object, the district court says. We were given the opportunity, but that is not, as the courts will tell you over and over again, the Supreme Court downed down, so were the people in the city of Cleveland. They were given an opportunity, but that is not the same as being joined in the matter. Sports, NRA sports stuff will tell you the same thing. A fairness hearing is not the same as a full adjudication of your rights. We weren't even allowed to present evidence. We were, all we were allowed to do was make an oral argument at that time. So, first of all, it is not our duty to intervene. The Wilkes case, I apologize, Your Honor. Okay. Thank you. Okay, Mr. Becker, no, sorry, wait. Rogers. Sorry, Rogers. Steve Rogers. I represent, may it please the court, good morning. I represent three former managers of Stanford companies who are in a similar position to a number of the other courts. The first point I want to make is that the receiver is actually asking the court to change the law in this case. We believe that the court should not do that. The receiver wants to change the law in this circuit to say that receivership courts can do, have superpowers that even bankruptcy courts don't have. And the reason they're making that argument is because the existing law in this circuit, many cases in bankruptcy court, including the VTAC and the Zale case that we'll be talking about, are contrary to the result that the receiver is trying to defend here. If the court adopts the interpretation to expand the equity power of a regular occurrence in our district courts, I don't think we want that. Judge Jones, you asked about the Texas law, the Suriano case, and those lines of cases that talks about where you have multiple claimants. I think the answer to that is in the OGA case that was decided earlier this year in this circuit. Judge Reveley, writing the opinion, basically says, and this is a case where a bus overturned and a small group of claimants exhausted all the available insurance, and the court said, that's all well and good, but we have not yet decided the question of whether this distribution is fundamentally fair as a matter of equity. So to me, what that means is that whatever Texas law may provide about claimants being able to exhaust available proceeds, that does not answer the question of what's equitable in a federal court. Well, what are you going after? Are you going after the extra, I'll ask the same question as Judge Southwick, are you going, do your claims encompass contractual rights, non-contractual rights? Yes. Bad faith court, what? Yes, they do, Your Honor. To be honest, we're primarily concerned with our contractual rights to receive reimbursement for defense costs. My clients and a number of the other appellants are being sued in the Clawback lawsuit, where the receiver is seeking to take away compensation, various forms of compensation that my clients receive in the course of their employment with their Stanford employer. And so it's not, we do not believe that it's by accident or coincidence that the receiver advocated stripping my clients of their defense benefits under the policies, because the receiver is going after them. What explanation did the receiver have for distinguishing between your clients and the 16 clients, the 16 insured who were exempted from this bar order? I have no idea, Your Honor. I've thought about that a lot. This case is kind of standing on its head. The 16 most culpable people that had this inner circle that was responsible for this entire fiasco, they're the ones that get the royal treatment instead of the former employees and managers. Again, I think the answer is that it serves the receiver's purposes to strip them of their defense benefits in the lawsuit that the receiver is trying to take away their compensation. That's the only explanation I can come up with. I would like to point the Court to the oral hearing that was held on October 28, 2016 in the trial court. That's the hearing where Judge Godbee said, I know a lot of you here were expecting to be able to put on evidence and do that. We're not going to do that today. No such hearing was ever afforded, although the Court did allow the filing of materials and objections. Counsel, to what extent does this settlement have additional, have some of the problems related that are being brought to us today? Because there never have been any decisions on the various coverage disputes that have existed, insured versus insured, the other exclusions that have been in play that have never been resolved by the district judge. To what extent has the, I'm going to use the wrong word, but the failure to rule on those motions contributed to the various kinds of arguments that we have here today, and to what extent would resolving those eliminate a lot of the problems that we're facing? Thank you, Judge Suffolk. That's a great question. You have a great answer? I'm going to do my best. There has, the case 1736, the big case is 298. That's the whole receiver and others trying to get out of coverage. And that case and those coverage questions were also decided by Judge Godby. And so they have been decided, contrary to my clients. The problem is that my clients never got an evidentiary hearing. They decided in this judgment that is on appeal here today? That's my reading of it. Right. I mean, the settlement resolved it and Godby accepted it. But there's never been an independent decision based on the law as to how these different issues should be resolved, has there? There's certainly not been a decision that focuses on the relevant coverage issues. There's never been a determination on the merits as to whether there's coverage and whether the various exclusions apply. Did your clients file a coverage lawsuit? No, no, Your Honor. We have not filed a I do not believe so because the coverage question has been under constant litigation since early, since 2009 and my clients are part of that lawsuit. Between Lloyds and the receiver, you mean? Yes. Yeah. It's been actively litigated and I think that's all that's required to satisfy the limitation. Well, if it's Lloyds filing a declaratory judgment against the receiver on coverage? Yes, Your Honor. Is that what that was? Yes, Your Honor. But if you look at the transcript, my clients are parties in that lawsuit. So you're okay. It's an ongoing, but then you were separately sued in a clawback action? Yes. Yes, Your Honor. That's the Elvira case. All right. Thank you. I see my time is up. I appreciate the court's time. Thank you. Okay. Mr. Price? My clients wear a completely different hat. They're plaintiffs in the lawsuit against the Stanford brokers and the insurance company. Unlike the other appellants, our lawsuit was in August of this year. Your clients are investors? Yes, sir. Yes, sir. My clients have been to the United States Supreme Court based on the Roland case that came out of the Fifth Circuit and the Chadbourne case was decided in our favor that gave us the right to bring an action in state court and that's what we're here about. I mean, it's a very unique situation when the United States Supreme Court says that you have a right to bring a state court action and then we get a permanent bar against the state court action because of pretty much an equitable action. Now, unlike the other appellants, mine is affected by the law relating to stay of state court proceedings. It's not an equitable issue. In the case of Atlantic Coast, it clearly says you don't look at equitable considerations when you're staying in existing state court action. The second thing is, is that this case has far-reaching ramifications and I want you to ask the appellees this. There's no case in the United States where an existing securities action has been stayed by a federal court. Now, there are plenty of these cases which are cited where there are indemnification claims between third parties where they bar them or there's plenty of law out there that precludes a suit against a receiver. There is not any circuit cases that would stay a state court. The reason this case really stands bar is that in a bankruptcy context or an equitable receiver context on a pre-existing securities law lawsuit, they would always have the right under the aid of jurisdiction exception to say the case is stayed. So, the Supreme Court of the United States ruled that we weren't precluded from filing a state court action. You have a direct action, right? Yeah, a direct action. You're calling it a securities case, but it's a direct action. Well, it's a securities action under the Louisiana Blue Sky Law and what we were able to do is to use a negligence standard under the Louisiana Blue Sky Law to bring the action, but that's what was decided is that it was decided that federal law wouldn't apply and the state securities law would apply. The defendant in your case is the underwriter. The defendants are two people. It's the underwriters and we can bring the suit against the insurance company by virtue of the Louisiana direct action statute and the Louisiana direct action statute says we're a third party beneficiary to the contract, but we also have filed an action against the insureds that give us a direct claim against the insured brokers and the settlement agreement and the receiver may disagree with this, but if you look at the terms of the statute, it gives us the right to bring the claim. So, in other words, our position is real simple. It's a high bar to stay a state court proceeding. It's a de novo review as opposed to the much higher standard of being fair and equitable and even within the de novo standard under the Supreme Court case of Smith, every benefit of the doubt has to be resolved in our favor because you're staying a state court action. So, when you stop and think about our claim, it's the highest bar that has to be met. Our feeling is the district court ignored Atlantic Coast. Chadbourne gave us the right to move forward in state court. There's no issue though of receivership in Chadbourne, was there? There's no issue of the authority of the receiver in Chadbourne, was there? I'm sorry. There's no issue of whether the receiver might have the right to bar your action raised in the Chadbourne case, was there? I mean, I don't agree that there's no issue as to whether or not they can bar our case. I mean, I've never had a Supreme Court reverse with an equitable receiver. Well, we'll have to decide whether it's proper to do so, but all I was raising, I don't think Chadbourne addressed the specific issue. No, it didn't address the receiver issue, but the SEC was on the other side of the aisle from us and they were arguing against us in that case and this is an SEC receivership. And so, SEC lost the case at the Supreme Court and it's back again with the second bite of the apple. You know, when you start looking at the equities of the situation, I represent 30 people that have been involved in this litigation for nine years and if you look at the equities of the situation, going all the way up and winning the case and then having the case dismissed or effectively dismissed in this manner, that's just not ethical. Thank you, counsel. Thank you. All right, Mr. Sadler. Is this the other side finally? Yes, Your Honor. Good morning. Good morning. I want to walk the panel through this because there's a really clear path to affirmance here and as I walk you through that, I'm going to have to correct some of the things that my colleagues, the appellants, said that were just wrong and they're demonstrably wrong on the record. Just to be clear, you're representing the receiver? I represent the receiver. I'll be speaking first. Lloyd's counsel will follow me when my remarks are concluded. There's only two questions in front of you. The first question is, the district court in this receivership context have the power to issue an injunction to stop litigation. That's not a new question. That question has already been answered twice within this receivership by the Fifth Circuit in opinions in which two of you served on the panels saying, yes, the district court has the power, deriving from his exclusive jurisdiction over receivership property and assets, to issue an injunction stopping third-party litigation. So the question of power has already... So it can stop third-party litigation by the, let's say some bank had sold the Stanford entities a fleet of cars, and when Stanford failed, they kept the cars, but they didn't pay off the money owing on the cars. And the lender decided to file an action to foreclose on its security interests. And even though the lender had secured interests, that the receiver could stop any kind of litigation or collection activity from going on. And the answer to that question is yes, and it's already happened and been affirmed by this court. Because what happens in this receivership is everyone who had a claim against any of the Stanford companies, any of the Stanford employees are funneled into the receivership process. So you're saying this receiver has powers far, far beyond those of the bankruptcy court, which of course evolved from the receiverships of the 19th century. And the bankruptcy court can only divest a party of its secured property interest under limited circumstances, which have a constitutional backdrop, but the bankruptcy court can stay foreclosure on secured interests, but it can't bar it. And you're barring people from executing their exercising property rights. Your Honor, what we're doing is exercising the power that the case law gives us deriving from the exclusive jurisdiction over receivership property. Bankruptcy law may be analogous in some circumstances, but the bankruptcy statutes don't control here. And let me direct your attention to why this is so critical and gets at the heart of this receivership. We have a piece of receivership property. It's a collection of insurance policies. There is no question that this court, the receivership court, has exclusive jurisdiction over that piece of receivership property. And that is the essence of this receivership. We have competing claims. But what you've got here, what you've done is you've lumped together three different kinds of policies. And one of them is B&O policies as to which nearly all of these appellants here, not all, not the Price, Mr. Price's clients, but the others are coinsured. That is exactly right. And what has not been mentioned so far and which I will direct your attention to now is the receiver is entitled to make two different kinds of claims to this policy. That's why he's first in line. He is a first party insured under the financial crimes policy. None of these people have any kind of claim under that policy whatsoever. Second, the receiver holds two judgments in his hand that he has already presented to Lloyds in excess of $2 billion under this policy. And this gets to one of the critical findings of the district court that supports this settlement, which is regardless of any of their objections, there is no pathway for them to recover ahead of the receiver. And why is that? Because if we blow up this settlement, which is what they're asking you to do and deprive the victims of $50 million right now, one of two things will happen. Less $14 million. Less $14 million for attorney's fees. So it's $65 less the attorney's fees. But let me be absolutely clear about this because they have no answer to it. If we blow up this settlement, send it all back to litigation to litigate to a conclusion the issues Judge Southwick, you brought up, you know, coverage, what's left, this defense, that defense. Only one of two things is going to happen. The receiver will prevail on his claims that he has directly and he'll get every single penny that could possibly squeeze out of this policy if he wins. But if he loses on one of Lloyds' coverage defenses, he not only loses, they lose because all the insurers are subject to a whole laundry list of defenses. Let me ask you a question about that. Why couldn't Judge Godbee have ruled on the coverage defenses in the past nine years? So, Your Honor. I mean, it's equally unfair, not that I'm taking sides in this, but it's equally unfair to make insurance companies pay up tens of millions of dollars if they're valid coverage defenses, as it is to deprive co-insureds, you know, take away any rights they have under the policy while you're suing them for clawbacks on the other side. You know, I mean, there's plenty of a perception of unfairness all around here. And I just don't understand. Coverage is coverage. Federal courts handle coverage disputes all the time. Absolutely, they do. But what happened? It cost $14 million to litigate. Well, Your Honor, we were in some very difficult litigation with Lloyds, pressing our claims until we reached a settlement. And if you're going to set the standard for a settlement is we have to litigate to a conclusion all the disputed issues, well, you don't need a settlement at that point. The problem I have with this, one of the problems with this bar order is that the district court basically told these appellants, you were going to lose anyway, so now I'm going to bar you. So they really never got what they purported to want, which was a coverage dispute. Let's talk about each of these objecting groups, starting with the last group, Mr. Price's group. These are the Louisiana objectors. Who are they? They are people who filed claims in our claims process. They are people who are going to share pro rata this settlement if it goes through. That's not the DNO policies. What about the DNO policy? I beg to differ, Your Honor. They're direct action against the financial advisors who are the other group of objectors. They don't stand the Louisiana objectors. They don't have any extra ways to cover it. It's just a gimmick under Louisiana law that says if you're suing somebody that has insurance, you can go ahead and name the insurer. We know about the direct action section. Understood. But this gets back, Judge Southwick, to another question that you raised, which is all this talk about extra contractual and all that. None of these people have claims except for the existence of this insurance policy. All traces back to the insurance policy. Let me ask you about the extra contractual claims. What are they? Are they claims, as I was asking? Sorry, not remembering which one. One of the appellants. Is the bad faith and the other extra contractual claims arising out of this negotiation between the two sides, or does it predate the settlement? But if you look at Mr. Heyman's lawsuit, which he's the one that actually has an action on file, what he's suing for is the policy proceed. And he says it was wrongful for Lloyds to deny my claim for coverage. Well, can we divide this into claims that would not come up from the policy, but would come from Lloyds? Other loose chains that might have lying around, but would not come from the total amount of the policy coverage. Are there such claims in this case? So they would describe those as independent extra contractual claims. And my point is that those claims don't exist but for the policy. It all traces back to the policy, which is a receivership asset. It's not coming out of the race of the policy. It's not coming out of that body of dollars, however much it might be after the coverage disputes are resolved. The mere fact it draws out of the obligations of the policy, I don't know what to make relevance of that. Well, I'll tell you what to make of the relevance of it, is they, the objectors, are holding hostage this policy, which belongs exclusively to the district court, and saying you can't approve any settlement that we don't agree with. And that is why members of the council... That is not at all what their brief is saying. Their brief is saying, A, coverage defenses were never litigated. B, we never knew. We're all claimants on the same fund. This is not precisely the pride transportation or that kind of situation. This is a common fund race that the district court has to equitably take care of. I don't recall even hearing this argument about the $2 billion in pending judgments before you mentioned it today. But maybe I just wasn't...  Okay, I read your brief. Thank you. I forgot it. There's a lot of stuff... Understood. There's a mountain of paper and... But my point is, they didn't have an opportunity to put on any evidence. The district judge's opinion is written in a rather conclusory faction. You would have lost, so the bar doesn't harm you at all. I disagree, Your Honor. First of all, with the due process part. Due process is a guarantee you'll be heard in a meaningful way. It's not a guarantee your objection's going to win. The statement's been made that objectors were not allowed to offer evidence. That's just plainly wrong on the record. The judge invited and gave plenty of time for people to file whatever affidavits, whatever evidence they wanted. And that is totally within his discretion to do that. So the idea that people were barred from bringing evidence, that's just not true. It's just not borne out by the record. What is borne out by the record is we have receivership property over which this court has exclusive jurisdiction. And the reason it's set up that way is exactly what we have here. We don't have enough money to go around. We can't give it... How long has this thing been going? 10 years, right? This is the 10th year? Absolutely, Your Honor. Has the dime been paid out to a single investor yet? Absolutely. We have distributed more than $100 million to claimants. This would be another $50 million going to claimants. Let me ask you another question, though. Why did you, your client, refuse to go along with the settlement which would have... Where the insurance... Obviously, the insurance company saw there was some problem with the settlement unless all of the people involved in the D&O policies were released. And your client refused to go through with that and insisted in the end on releasing only 16 of what they say are the most guilty people. Right. So let me answer that question correctly because I think the record was confused as it was explained to you. The people who were released as part of the settlement, that is, the receiver only released one group of people under the settlement, Lloyd's and the Lloyd's Parties. Period. Full stop. It's clear from the settlement agreement. Second, we dismissed, we, the receiver, we dismissed claims against 16 individual people. And those 16, we didn't release them. We dismissed the receiver's claims. So they're not going... They wouldn't be making claims on this policy, right? Well, Your Honor... The point of the bar order is that we are done litigating over this policy. That's the point of the bar order. We're not done litigating against these appellants, however, right? But for the possibility of clawback action. Well, that's another thing I need to clear up. The people who were excluded from the settlement, didn't get a release, we didn't dismiss our claims, is a long, long list of people, almost 150 still left, against whom we have pending fraudulent transfer claims set for trial this spring. You know, the golf case might cast some doubt on those, but are you, you claim to be going to trial against 150 dependents in one fell swoop? We have sued, we originally started with 235, we've settled with 70. But now, as to these others, to the extent they are under the DNO policy, this settlement deprives them of any opportunity to make a claim. It does not deprive them of anything with regard to our fraudulent transfer claims, because it is my view, and counsel for Lloyds will back me up on this, as will the Fifth Circuit, clawback claims, fraudulent transfer claims, are not covered. Period. Full stop. Why didn't you just get the district court to issue an order to that effect? Your Honor, I think that goes, it cuts at the fundamental reason you have a settlement in any case. If you litigate everything to the end, there's no point in having a settlement. You're taking the sweet and leaving the bitter to everybody else. The bitter, I disagree, Your Honor, because the bitter is there isn't enough money under this policy to take care of everybody, and that's why you have a risk. You're settling three policies in one swoop. We are settling all the claims under all the Lloyds policies. That is absolutely correct. And let me just take a, for instance, let's suppose we blow up the settlement, we go back to district court, and the receiver litigates with Lloyds just one issue, how much is left on the policy, and we get to the end of that issue, and Lloyds wins, and there's only 40 something million on the policy. That's not a coverage issue. The coverage issue is, does Lloyds have to cover certain acts, and are there exclusions? Exactly right. So let's take that example, which is something the district court directly addressed. I don't understand. Again, it just doesn't seem fair to me that the district court gets the whole, I mean, even in bankruptcy court, they don't typically hold people up for tens of millions of dollars in a quote settlement. I don't understand the hold up comment, Your Honor. Because if Lloyds has defenses, they should have defended. And that absolutely gets back to the fundamental point here. If we get rid of this settlement and litigate to the end, only one of two things is going to happen. None of us will get anything. No victim will get anything because Lloyds wins. Under the bar order, these people who thought they had coverage for their defense costs get zero, because the bar order covers not only their claim on the policies, but any extra-contractual claims, which you are ex cathedra informing us they do not have. Your Honor, what I'm saying is— That's correct. We cannot have a settlement in this situation where we have an insurance policy that can't cover everyone. There's not a single case where parties have been subjected to a bar order for claims that they held. I don't know whether they're meritorious or not, but any kind of bar order for claims they had, independent of the race, as Judge Southwick put it. I think the closest cases to that are Coletta out of this court and DeYoung out of the Tenth Circuit, which followed Coletta. I looked at Coletta, and I don't see this at all related to this. It seems to me that the only opinion out of this court dealt with a much narrower—weren't dealing with the insurance policy primarily, which came later from Judge Atlas. And so it seems to me that a case that so far as factually fits our case, where you have a bar order that doesn't just protect the fund, but in order to get the holder or contributor of that fund to settle, you agree that person can't be sued for anything else either, independent of the fund. I don't think there's a case like that, but if there is— What we're about to get to is can't be sued for anything related to the policy. We're not trying to cut off—if somebody, one of these people, had a claim against Lloyds because Lloyds insured their house, we're not trying to cut that off, Your Honor. And I think Coletta and DeYoung speak to this issue because they're cutting off permanently lawsuits that people want to bring, and they're wanting to bring them for the same reason these people said they want to bring them. Wait a minute. We didn't agree to this settlement. We think you left money on the table. We want to go after it. Counsel, I don't mean this in an adversarial way. I just want as clear an answer to help me work with this. I don't think Coletta supports what you're doing in this case. I just don't think you have a fund at issue in the litigation, and the bar order goes beyond people trying to access that fund. Now, it could well be, and I don't quite understand your answer you gave me earlier, that there aren't any real claims like that involved here. But to the extent there are, it seems to me this is a very troubling settlement and bar order that is part of a settlement. The second part of it, though, in which we respond, well, no, I'll wait for Lloyds to deal with that. Do you have anything further to say on that? Let me speak to that because I think there are a couple of very, very good answers to that. First of all, just like in Coletta and just like in DeYoung, cutting off litigation that settlement. And that was both the case in Coletta where you couldn't have the settlement without the defendants in that case. I agree it wasn't an insurance policy, but the defendants who were funding the settlement needed to be free of litigation. And that is what we're dealing with now with Lloyds. Those individuals still had assets, according to Judge Atlas's opinion, could have been pursued. And so you were cutting off. It's the policy was bigger and still was money left in it. And those were barred. And I don't see that as the finite fund that we have here. And you're barring suing Lloyds for their separate pot of money that they may have. And, Your Honor, I think it comes down to the question you asked earlier in the argument, which is all of these claims, regardless of what they call them, extra contractual, not And I will leave you with this thought. We start with the proposition of exclusive jurisdiction over this asset. And the judge reached a reasoned decision on how the asset is going to be apportioned. It's not exclusive jurisdiction if you can blow up the settlement just because somebody doesn't like what they're getting out of it. That's why we have a receivership court to hear people's competing claims. And resolve it. I felt a lot better about this if they had actually heard their competing claims. Your Honor, all he did was all he did was he let you fellows go into a back room or maybe you went into the back room all by yourselves and come up with something that arbitrarily. I don't know whether it was you all decided, as I said, ex cathedra who everybody's rights were and the district court, frankly, just seemed to bless it. I don't think anyone in 10 years has ever accused Judge Godby of being a rubber stamp for this receiver. I didn't say he was a rubber stamp and he blessed the settlement and he blessed it, Your Honor. After an open hearing, inviting all parties to come and register their objection if they had it to file evidence, whatever it was that they had it. And that is the due process. That is the answer to the due process argument. People were hurt. There's not enough money to go around. And I will, the red light is on, but I do want you to understand, the one thing I do agree with, one of these appellants said, is this case is hugely important because there are other settlements, just like Mr. Heyman got a bar order, there are other bar order settlements. And if you deprive the court of this tool on these facts. It's not depriving the court of anything if we were to rule against the receiver. What we would be saying is that the receiver's ability to manage the property goes only so far as the property. We wouldn't, it's not our personal thing. It is the fundamental power of courts to take from A and give to B without a legal basis for doing it. And Your Honor, I submit the legal basis is all of their claims are connected to the policy over which the receiver is supposed to have exclusive control and the district court exclusive jurisdiction. All right, sir. Mr. Munguia, let's continue the discussion. May it please the court, my name is Manny Munguia and I'm here on behalf of Certain Underwriters, Boys of London, Art Specialty Insurance Company, and Lexington Insurance Company. And I'd like to address the fairness and equitableness of this settlement. And I think one of the issues that I think has kind of been lost here is the $2 billion judgment that the receiver has and how that interacts with the Soriano case. And I don't think that the district court was saying that the appellant just lose. I think what the district court was saying is in light of the receiver's judgment, well in excess of the policy limits, there's really not a pathway in which they ever would have accessed the policy proceeds. And so to address your question with respect to the D&O policy, they are making a claim under the D&O policy for a lawsuit by the receiver. The receiver, in our view, has stepped into the shoes of the Stanford entities and sued them. In our view, that's excluded from coverage under the D&O policy by the insured versus insured exclusion. If we're correct— But why didn't you ask Judge Gobby to give a simple declaratory statement about that? We did. We filed, in our litigation against Coral Heyman, we actually filed a motion for summary judgment on that issue. It is actually pending, was pending prior to the settlement. So we have sought a determination on that issue. But I think what— Not one basically, right? Well, I think what the district court recognized is if we're right on that, if we're correct on the insured versus insured exclusion, none of these policy proceeds will go to the receivership estate because the receiver will have no path to getting it. What about the bar for extra contractual claims? I think that's a good point. I think every bar order bars claims. The argument I think that the appellants have raised is your extra contractual claims would be paid not from the policy proceeds but from your own assets. They'd be paid by the insurer. By the insurer's own assets. But I think every bar order is paid by the third party's own asset is barring claims that would otherwise be covered by the third party's own assets. So I think if we look at Mr.— Mr. Sadler's otherwise interesting argument, he was not able—he did not cite a case to us where a bar order has extended to independent claims against the third party which are not the assets of the receivership. I think we can look at Mr. Hayman no further than— Cite a case. Cite a case. Well, I think in the Coletta case when the bar order with respect to the individuals that got claims that were barring investors from suing them, had those investors' claims been successful, that were barred, they would have been paid out of those individuals' own assets. And I think the same could be held for Mr. Hayman. He has a bar order that precludes claims such as aiding and—he was a director of Stanford Trust Company. His bar order precludes claims such as aiding and abetting the Ponzi scheme or civil conspiracy. Presumably, if those claims would have been successful, they would have been paid by Mr. Hayman's own assets. And the receiver addressed some additional settlements that have been reached with—there's a settlement with Willis. There's a settlement with some law firms—Proskauer. The claims against those entities are for aiding and abetting, are for conspiring to further this Ponzi scheme. But the point there is, I believe, that you're not letting investors sue them because the extent that the receiver sues, he's standing in the shoes of—for the investors' sake. I think that's correct. All right. But in this case, these people would be suing simply because they had a contractual right of your companies to defend them, which you did not—which, according to them, you did not fulfill, and therefore they may have bad faith claims. That's correct. But I think with respect to their contractual claims, our position is those are not covered. But the receiver has no way to recover their extra contractual claims for the benefit of the receivership estate. And in fact, those—your insureds are completely excluded from everything, as I understand. I think with respect to this, the Court weighed the value of those purported claims in light of a case—the Soriano case. And under Soriano, in light of the receiver's $2 billion judgment, we could have taken the policy proceeds, whatever the limits of their— All those cases—all those cases say we are not excluding the possibility of bad faith claims. Sportstuff says that. Zale says that. I forget what—I think Pride Transportation says it. And the only case you've relied on so far is Coletta, which is an unpublished two- or three-page decision of this Court and not precedential. So I think that what we're saying with respect to our ability to pay all of the policy proceeds to the receiver to the exclusion of the other co-insureds is Soriano case, which is a Texas Supreme Court case. And what it says is that the insurers have the ability to do that, and they will not face any liability, including extra contractual liability, if that's reasonable. And our position is, in light of a $2 billion judgment— Indiana World Exposition says that the—that it's not excluding the possibility of bad faith claims. Right. But the only avenue for that would be if the settlement were unreasonable. And in this particular case, in light of a $2 billion judgment that's facing the underwriters, underwriters have to decide whether or not they want to risk the possibility that they're wrong with respect to their coverage exclusions, and if they are, face that extra contractual liability, or pay all of the policy proceeds, whatever those limits may be, to the receiver. In that scenario, even appellants concede that we would have the right under Texas law to do that. And so what Judge Goddard was looking at is, in light of that case law that gives us the right to simply give all of the proceeds right now to the receiver, in light of that right, what they're losing is not that valuable. $2 billion would come out of the policy coverage, whatever that amount may be. It wouldn't come out of the extra assets of Lords or anybody else against whom the suit may be brought. So the only benefit of barring such claims is to encourage Lords to settle the lawsuit. I don't see where Soriano has any relationship to that. Well, I think the benefit is giving the insurers the right to settle those claims for the policy proceeds, and encouraging that by finding that they will not, that the insurers will not be liable for extra contractual damages. And so I think in light of the Soriano case law, what the district court said was the value of the claims that the appellants are losing is not very high. On the flip side, the value of this settlement to the receivership is enormous, because if the court does issue a ruling on the insured versus insured exclusion, for example, it's very possible that none of the proceeds will go to the receivership estate. So when you're balancing the value of this settlement to the receivership estate versus the value of theoretical bad faith claims, and the reason I say they're theoretical is because I do not think that there's any court that would find that if Underwriter simply took all of the policy proceeds and gave them to the receiver in light of the receiver's $2 billion judgment, that that would have been unreasonable. And under Soriano, the test is, is it reasonable to give all of the policy proceeds to one claimant to the exclusion of others, and given a $2 billion excess judgment, that would have been reasonable? And that's the issue that Judge Godbee was looking at. Why were you looking, why were the insurers apparently originally looking for the receiver to, not indemnify, but release clawback claims against all your insurers? So in our opinion, we would have liked to get as many insurers out as possible. If we would have got them all out, we would have taken that. In fact, we filed a motion to get them all released. And we, in fact, filed a motion with the district court trying to enforce a settlement that would have got them all released. But not only did the receiver object to that, the examiner, the creditors committee objected to it. And the reason they objected to it, and the reason what's different about all of these appellants today, is all but Hayman were sued for fraudulent transfer. And we think under clear Fifth Circuit precedent, those are uninsurable claims, which is why the examiner, why the creditors. But the problem with the claims, too, frankly, to the extent that they perform services and can, like the golf case. Well, I, well, I would, I would agree that goes to the merits of the underlying claim. Yeah, but the problem is that presumably these people don't have the extensive resources to defend against cases from an extremely well-financed receiver. Again, I, I think that goes to the underlying liability case. But with respect to the insurability of those issues, the Fifth Circuit has addressed that and said that fraudulent transfer claims are restitutionary in nature. And so they're not insurable. So what they're. But again, I mean, it's fine for you and the receiver to sit back in, in your own, you know, courtroom and decide, well, this is what the Fifth Circuit says about this policy and this is what the, but oh my goodness, we're risking, you know, $100 million on these other coverage defense. How come, how come your defenses are so questionable, but their, but their claims are absolutely frivolous? I don't think that we're only looking at the risk to us. I think what the receiver was looking at is the risk to aggrieved investors and the risk to aggrieved investors that this settlement does not go through as significant. They lose $65 million and there is a very real chance. And essentially what the appellants are asking is to gamble that $55 million on their theoretical bad case plan. Maybe they were asking for a seat at the table because the investors had a seat at the table in this mediation. And maybe they were asking for a seat at the table that says, we want you to dismiss clawback claims against us. And again, I think that they've separately had negotiations. There have been settlements of some of the clawback defendants. That's not before us, but. Right. And I recognize that and my time's out, but just to touch points, I don't think it would have changed the calculus here that their claims have very little value. And the value of this settlement to the receivership, the state is enormous. If it goes back and we litigate the insured versus insured exclusion and we prevail, nobody's getting anything. This settlement recognizes those risks and gives the, as the district court correctly concluded, it was the best alternative available that would secure funds to the receivership estate that could be paid to investors. Thank you. All right, now we have two rebuttals, two minute rebuttals, anybody wants to do them? Please, the court. I think they're the I'm sorry, Mr. Porter, I apologize. I think the whole argument that can be summed up is no sacrifice is too great for our clients to make on their behalf, that there is absolutely no basis for their claim. First of all, it is irrelevant whether the insurance policies or proceeds are property of the estate. The court has held the receiver stands in the shoes of receivership entities, therefore requires no greater interest in those properties than the receivership entities have. As stated, Marshall v. New York, a receiver is appointed by federal court, takes property subject to liens, priorities, privileges existing in state law. Whatever the receiver claims in those policies, they are subject to our independent claims and rights as well. And therefore, this And what's your response to their invocation of Soriano? Again, what I say is that we have the right to challenge two things. One, was this a reasonable settlement? We made claims too, at the same time. So the decision on which claims to pay is totally on us, and it is not a decision that the judge gets to make before us whether we get to challenge whether they made those payments in good faith. Was there any basis at all? Second of all, they aren't making complete payments. They are taking away $35 million, so under Soriano wouldn't even apply because the total was proven and had not yet been paid. So what do you say about the $2 billion judgment? Well, it hadn't been paid. If they want to pay the total proceeds and let us challenge whether they have paid it or not, fine. But again, if we have no claim, why are we here? Why did they take $65, initially they filed an emergency motion in the court demanding that we get our claims waived along with, as part of the settlement. Then, they wouldn't pay $65 million unless our claims were extinguished. Now they want to tell you our claims aren't worth anything at all. If our claims are not worth anything at all, why are they essential to this settlement? If they do have value, bring us to the table and make us part of the negotiation. They have not done that. They want their cake and they want to eat it too, and they want us to pay the bill. And there has been no court case that they can cite that does three things. Puts a permanent bar order on non-settling parties. I'm sorry, where am I? You have all four minutes, I don't know if you've got that. Go ahead. This is because I have a different claim. Judge Jones, you got it right, the insured versus insured exclusion excludes the claim of the receivership. If you look at the last ten pages of our brief, you'll see that the only capacity that the is on behalf of the company and the policy specifically excludes that. Why didn't they litigate the insured versus the insured exclusion? It's real simple. The insurance company wanted to settle for less than policy limits because we all know, as you suggested earlier, that if they had settled for policy limits, they're out. They don't need the releases like here. So what this settlement is, is that the insurance company entered into a deal with the receiver where it could get total peace. And getting total peace, what they did was they had to get a release of the defendants, which the bar order not only precludes a claim against the insurance assets, it includes a bar against me suing the defendants. And that's, in essence, what has happened is it's not an insurance settlement, it's a peace settlement, and they realize they can use this procedure to get peace. All right, sir. Yay, someone gave us time back. All right, thank you very much.